ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE
————————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
————————————————

No. 22-3058
————————————————

UNITED STATES OF AMERICA,                          Appellee,

v.

JOEY GREEN-REMACHE,                                Appellant.
————————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
————————————————

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
ELIZABETH H. DANELLO
KIMBERLY L. PASCHALL
RYAN H. CREIGHTON
EMORY V. COLE
* ANNE Y. PARK
D.C. Bar #461853
Assistant United States Attorneys

* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
(202) 252-6829

Cr. No. 20-124 (APM)

# Certificate of Parties, Rulings, and Related Cases

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

The parties to this appeal are appellant, Joey Green-Remache, and appellee, the United States of America. There are no amici.

## Rulings Under Review

This is an appeal from the judgment of the district court (Honorable Amit P. Mehta), filed on March 23, 2022, sentencing Green-Remache to 51 months of imprisonment after he was convicted by a jury of interstate violation of a protection order. Green-Remache alleges that his trial counsel was ineffective in failing to object to the admission of expert testimony from Dr. Chitra Raghavan, and he seeks a remand for an evidentiary hearing on his ineffectiveness claim.

## Related Cases

Appellee is unaware of any related cases.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained in the attached Addendum.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE ............................................... 1

Government's Notice of Intent to Introduce Expert Testimony
of Dr. Chitra Raghavan and Voir Dire Examination ....................... 4

The Trial .................................................................................. 7

The Government's Evidence ..................................................... 7

    1.  Background ................................................................. 8

    2.  April 12, 2020 .......................................................... 11

    3.  Dr. Chitra Raghavan ................................................ 21

SUMMARY OF ARGUMENT ....................................................... 26

ARGUMENT ............................................................................. 27

The Trial Record Conclusively Shows That Green-Remache
Cannot Sustain His Ineffectiveness Claim. .................................. 27

    A.  Standard of Review and Applicable Legal Principles ........ 28

    B.  Discussion ................................................................ 31

CONCLUSION ......................................................................... 42

# TABLE OF AUTHORITIES*

**Cases**

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)...................30

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ....................29

*Massaro v. United States*, 538 U.S. 500 (2003) .....................................30

*Strickland v. Washington*, 466 U.S. 668 (1984)...............................28, 29

*Thomas v. Lampert*, 349 F. App'x 272 (10th Cir. 2009) ........................33

*United States v. Browne*, 953 F.3d 794 (D.C. Cir. 2020) .......................31

*United States v. Fennell*, 53 F.3d 1296 (D.C. Cir. 1995) .......................31

\* *United States v. Helem*, 186 F.3d 449 (4th Cir. 1999) ...........................40

\* *United States v. LaVictor*, 848 F.3d 428 (6th Cir. 2017) ................33, 34

*United States v. Murray*, 897 F.3d 298 (D.C. Cir. 2018) .......................31

*United States v. Rashad*, 331 F.3d 908 (D.C. Cir. 2003) .................30, 31

*United States v. Raymond*, 700 F. Supp. 2d 142 (D. Me. 2010) ............35

*United States v. Schneider*, 2010 WL 3734055
   (E.D. Pa. Sept. 22, 2010)....................................................................35

\* *United States v. Sitzmann*, 893 F.3d 811 (D.C. Cir. 2018).....................40

---

\* Authorities upon which we chiefly rely are marked with asterisks.

iv

*United States v. Torres*, 894 F.3d 305 (D.C. Cir. 2018) ..........................32

\* *United States v. Vasquez*, 729 F. App'x 383 (6th Cir. 2018)............. 33, 34

## Other References

18 U.S.C. § 1201(a)(1)..............................................................1

18 U.S.C. § 2261(a)(2).............................................................40

18 U.S.C. § 2262(a)(2).............................................................1

D.C. Code § 22-801(a) ............................................................1

Fed. R. App. P. 4(b)(1)(A) .......................................................3

Fed. R. Evid. 702 .................................................................35

Fed. R. Evid. 702(a) ..............................................................30

Fed. R. Evid. 702(d)..............................................................32

# ISSUE PRESENTED

Whether the trial record conclusively shows that appellant Joey Green-Remache's claim of ineffective assistance of counsel, raised for the first time on direct appeal, is without merit, and thus no remand is required, where: (1) Green-Remache has not alleged a colorable claim that his trial counsel was constitutionally deficient, because his counsel had no basis to challenge the admission of expert testimony generally discussing the dynamics of abusive relationships to explain recantation by victims of domestic violence, particularly given that federal courts have repeatedly upheld the admission of such expert testimony; and (2) he has not alleged a colorable claim that he was prejudiced by his counsel's alleged deficiency in failing to object to this expert testimony, given the compelling other evidence of guilt.

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

No. 22-3058

———————————————

UNITED STATES OF AMERICA,                           Appellee,

v.

JOEY GREEN-REMACHE,                              Appellant.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

BRIEF FOR APPELLEE

———————————————

## COUNTERSTATEMENT OF THE CASE

On November 3, 2020, a superseding indictment was filed charging

appellant Joey Green-Remache with kidnapping, in violation of 18 U.S.C.

§ 1201(a)(1) (Count One); interstate violation of a protection order,

causing travel of victim, in violation of 18 U.S.C. § 2262(a)(2) (Count

Two); and first-degree burglary, in violation of D.C. Code § 22-801(a)

(Count Three), based on an incident with his ex-girlfriend, B.P., on April

12, 2020 (AA 32-33).[1] On July 26–28, 2021, Green-Ramache was tried by jury before the Honorable Amit P. Mehta (AA 16). On August 2, 2021, the jury convicted Green-Remache of interstate violation of a protection order (Count Two) and hung on the remaining counts (AA 17; SA 427-29; 8/2/21 Tr. 7-9). On November 8, 2021, Green-Remache appeared before Judge Mehta and entered a plea of guilty to first-degree burglary (Count Three), and in exchange for his guilty plea, the government agreed to dismiss the kidnapping charge (Count One) (AA 19, 315-33; 11/8/21 Tr. 5-17).[2]

---

[1] "AA" refers to appellant's appendix. "SA" refers to the supplemental appendix filed by the government. "GX" refers to government exhibits admitted at trial and included in appellant's appendix or the supplemental appendix. "Tr." refers by date to the transcript of proceedings.

[2] By pleading guilty to first-degree burglary, Green-Remache waived his right to appeal, including his right to appeal from his conviction and sentence for interstate violation of a protection order following his trial (AA 319-22, 329-30; 11/8/21 Tr. 11-14). Green-Remache, however, reserved his right to appeal based on the claim that he received ineffective assistance of counsel "either in connection with [his] trial or in connection with [his] guilty plea and sentence" (AA 321-22, 329-30; 11/8/21 Tr. 13-14). He also reserved his right to file a collateral attack motion based on newly discovered evidence or ineffective assistance of counsel, including in connection with his trial conviction (AA 322-24, 330; 11/8/21 Tr. 14-16).

During the plea colloquy, Green-Remache admitted the following facts: (1) after he heard B.P. on a phone call with another male, he entered B.P.'s apartment and pushed her down onto a couch; and (2) when he

(continued . . . )

On March 23, 2022, Judge Mehta sentenced Green-Remache to 51 months of imprisonment, to be followed by 36 months of supervised release, on the count of interstate violation of a protection order; and 60 months of imprisonment, to be followed by 60 months of supervised release, on the first-degree burglary count (AA 20; SA 6-7). Judge Mehta further ordered that the terms of imprisonment run consecutively to each other for a total term of 111 months of imprisonment and that the terms of supervised release run concurrently with each other for a total term of 60 months of supervised release (AA 20; SA 6-7). Green-Remache filed a timely notice of appeal (AA 20-21, 334-35).[3]

---

entered B.P.'s apartment, he did so with the intent to assault her (AA 317; 11/8/21 Tr. 9; SA 1-3).

[3] Judgment was entered on March 23, 2022, and the 14-day period to note an appeal under Fed. R. App. P. 4(b)(1)(A) expired on April 6, 2022 (AA 334). However, the district court granted Green-Remache's unopposed motion to extend the time in which to note an appeal *nunc pro tunc* to April 28, 2022, and to treat a pro se, April 10, 2022, letter by Green-Remache indicating his desire to appeal on ineffectiveness grounds as the functional equivalent of a notice of appeal (AA 334-35).

### Government's Notice of Intent to Introduce Expert Testimony of Dr. Chitra Raghavan and Voir Dire Examination

Before trial, the government filed a notice of intent to offer the expert testimony of Chitra Raghavan, Ph.D., a clinical psychologist and professor of forensic psychology (AA 34-66). Specifically, the government sought to offer Dr. Raghavan as an expert in the field of traumatic bonding and coercive control in the context of domestic violence (AA 36).

The government expected Dr. Raghavan to testify that: (1) coercive control is the use of various tactics by an abuser to strip the victim of his or her autonomy and to create or maintain a power imbalance; (2) trauma bonding is the strong emotional attachment that can form between a victim and an abuser as a result of chronic interpersonal trauma, during which the victim grows strongly dependent on the abuser; and (3) these coercive tactics and the resulting traumatic bond with the abuser can give rise to incongruous and seemingly irrational behavior by the victim that is often hard for a lay person, like a juror, to understand, such as the victim choosing not to leave or returning to the abuser; delaying or not reporting the abuser to law enforcement; recanting or lying to protect the abuser; or testifying on behalf of the abuser (AA 37-38).

4

The government argued that expert testimony pertaining to trauma bonding and coercive control tactics used by domestic violence abusers would aid the average juror in understanding the anomalous behavior of these victims (AA 39). The government made clear that Dr. Raghavan would not be testifying about the credibility of the victim or any witnesses in the instant case (AA 39). Dr. Raghavan would not interview the victim or review any statements of the victim before trial (AA 39). Dr. Raghavan would only testify about victims of trauma bonding and coercive control "in general terms" (AA 39).

At trial, Dr. Raghavan testified about her qualifications to testify as an expert. She had been a professor at John Jay College of Criminal Justice for 19 years and had received her master's and doctorate degrees in clinical and community psychology at the University of Illinois in Urbana-Champaign, where she received over 3,000 hours of clinical training in her Ph.D. program (SA 339-41; 7/28/21 Tr. 808-10). After receiving her Ph.D., Dr. Raghavan went to Yale University School of Medicine, where she obtained her post-doctoral fellowship training in psychology and ran a study looking at what factors helped women to leave abusive relationships (SA 339; 7/28/21 Tr. 808). As part of that

study, Dr. Raghavan interviewed "somewhere between 115, 200 women" and spent hours with them asking them about the violence in their lives and why they remained with or left their abusers (SA 340-41; 7/28/21 Tr. 809-10). She further testified that the focus of her research and publications, all of which were peer reviewed, continued to be on coercive control and traumatic bonding in the context of domestic or intimate partner violence (SA 343-45; 7/28/21 Tr. 812-14).

Defense counsel conducted an extensive voir dire of Dr. Raghavan, primarily trying to suggest that the focus of her scholarship and expertise was not on coercive control or trauma bonding in the context of domestic violence, but rather in the context of sex trafficking and same-sex relationships (SA 349-73; 7/28/21 Tr. 818-42). After his voir dire, defense counsel stated that he had no objection to Dr. Raghavan's qualifications (SA 373; 7/28/21 Tr. 842). The district court therefore recognized Dr. Raghavan as an expert in the field of coercive control and trauma bonding in the context of domestic violence (SA 373-74; 7/28/21 Tr. 842-43). Dr. Raghavan testified at trial as summarized below. Defense counsel did not object to the admission of her testimony.

## The Trial

### *The Government's Evidence*

On April 12, 2020, Joey Green-Remache, against whom B.P. had a Civil Protection Order (CPO), pushed his way into B.P.'s Washington, D.C., apartment and hit and choked her. Green-Remache then grabbed B.P., dragged her out of the apartment, threatened to kill her if she ran away or screamed, and drove her to Maryland, where he held a screwdriver to her head and raped her in his car. The government's primary witnesses at trial were B.P.'s neighbor, Michelle Talley, who saw Green-Remache push his way into B.P.'s apartment; B.P.'s roommate, Taera Berry, who saw Green-Remache assault B.P. and drag her out of the apartment; and B.P. herself.[4]

---

[4] At trial, B.P. recanted much of her grand jury testimony and many of the statements she had made to law enforcement officers and others on the day of the incident. She denied that Green-Remache: (1) pushed his way into her apartment and immediately started to hit her and choke her; (2) abducted her from her apartment and drove her to Maryland against her will; and (3) raped her. B.P. was impeached with portions of her sworn grand jury testimony, which were admitted as substantive evidence (SA 18-43, 393; GX 105; 7/28/21 Tr. 882). The government's summary of the April 12, 2020, incident in the text is based on B.P.'s grand jury testimony.

(continued . . . )

## 1.    Background

B.P. first met Green-Remache in 2014 or 2015, when they became romantically involved, and they were together "on-and-off" for about six years (SA 122-23; 7/27/21 Tr. 473-74). In early 2019, B.P. and Green-Remache were living together in an apartment on Good Hope Road, Southeast, Washington, D.C. (SA 130; 7/27/21 Tr. 481). During this time, they started to argue a lot, and sometimes their arguments turned physical (SA 127-28; 7/27/21 Tr. 478-79). In January 2019, during an argument, Green-Remache threw a book bag at B.P., and as she attempted to dodge it, she ran into a wall, causing damage to the wall

---

As we will discuss, B.P. was also impeached with prior inconsistent statements she made to the 911 dispatcher, the police, and the Sexual Assault Nurse Examiner (SANE) at the hospital (SA 44-46, 158-60, 164-66, 170-176, 179, 198-200, 220-22, 234, 272, 299; 7/27/21 Tr. 509-11, 515-17, 521-27, 530, 549-51, 571-73, 593, 645, 672; GX 106, 108, 109). At trial, B.P. claimed that she had lied to the police, the SANE, and the grand jury because she was mad at Green-Remache, and once she started to tell this "false narrative," she felt that she had to keep it going (SA 176-77, 243, 245, 253, 274-78; 7/27/21 Tr. 527-28, 614, 616, 624, 647-51). B.P. attempted to avoid being subpoenaed for trial because she did not want to incriminate herself by testifying against Green-Remache (SA 244, 287, 292; 7/27/21 Tr. 615, 660, 665). To secure her testimony at trial, the government granted B.P. immunity – i.e., the government promised not to use B.P.'s testimony at trial against her in another criminal case, so long as she testified truthfully (SA 244-46, 290-91; 7/27/21 Tr. 615-17, 663-64).

(SA 14, 128-32, 299-300; 7/27/21 Tr. 479-83, 672-73;). On February 10, 2019, Green-Remache hit B.P.'s head with a closed fist (SA 14, 135-41, 299-300; 7/27/21 Tr. 486-92, 672-73). The next day, Green-Remache picked B.P. up from work and they got into an argument, during which Green-Remache threatened to hit her again (SA 14, 140-41, 299-300; 7/27/21 Tr. 491-92, 672-73). Near the end of February 2019, Green-Remache moved out of B.P.'s apartment (SA 142-43; 7/27/21 Tr. 493-94). On February 26, 2019, Green-Remache had arranged to enter B.P.'s apartment and retrieve his belongings (SA 13-14, 142-43, 299-300; 7/27/21 Tr. 493-94, 672-73). When she returned home that day, B.P. found her closet empty and her television gone (SA 13-14, 144, 299-300; 7/27/21 Tr. 495, 672-73).[5]

Based on these incidents, on April 11, 2019, B.P. filed a petition and affidavit for a CPO against Green-Remache in D.C. Superior Court (SA 13-17, 127-28, 130, 299-300, 336; GX 102; 7/27/21 Tr. 478-79, 481, 672-

---

[5] After B.P. testified about these prior incidents, the district court instructed the jury that this evidence was only admitted for the limited purpose of deciding whether the alleged abduction of B.P. on April 12, 2020, was against her will (SA 144-45; 7/27/21 Tr. 495-96).

73; 7/28/21 Tr. 805).[6] On April 26, 2019, the Superior Court granted B.P.'s petition for a CPO, and in so doing, found good cause to believe that Green-Remache committed assault on February 10, 2019, threats on February 11, 2019, and theft on February 26, 2019 (AA 311-14; SA 336-37; GX 100; 7/28/21 Tr. 805-06). The CPO ordered Green-Remache, for a period of one year from April 26, 2019, until April 25, 2020, to not assault, threaten, harass, or stalk B.P. or destroy her property; stay at least 100 yards away from B.P.'s person, home, workplace, and vehicle; and not contact B.P. by telephone, in writing, by electronic or social media, or in any other manner, either directly or indirectly through a third party (AA 311-14; SA 336-37; 7/28/21 Tr. 805-06).

In April 2020, B.P. was living with Taera Berry in the Good Hope Road apartment (SA 65, 67-68, 182-83; 7/26/21 Tr. 381, 383-84; 7/27/21 Tr. 533-34). Berry knew that B.P. had previously been in a relationship with Green-Remache, but it was Berry's understanding that B.P. had

---

[6] At trial, B.P. claimed that she obtained a CPO against Green-Remache because she was angry with him, and she wanted to have "the last laugh" and show him that she was in control of the situation (SA 130, 146, 246-47; 7/27/21 Tr. 481, 497, 617-18). She denied seeking a CPO because she was afraid that Green-Remache would hurt her (SA 130; 7/27/21 Tr. 481).

obtained a protection order against him and was no longer in contact with him (SA 66-67, 87, 249-50; 7/26/21 Tr. 382-83, 403; 7/27/21 Tr. 620-21). B.P., however, continued to see Green-Remache despite the CPO and kept this fact hidden from Berry (SA 147, 247-50; 7/27/21 Tr. 498, 618-21).

### 2.    April 12, 2020

On the morning of April 12, 2020, Michelle Talley, who lived two apartments down from B.P. but did not know B.P., was returning home from work (SA 52-54, 59; 7/26/21 Tr. 368-70, 375). As she exited the elevator, Talley saw a man sitting on the floor outside of the elevator (SA 54, 59-60; 7/26/21Tr. 370, 375-76). The man stood up and turned to go to the door of the apartment where B.P. lived (SA 54-55, 60; 7/26/21 Tr. 370-71, 376). Talley was about six feet away from the man, when she saw a young woman "crack[ ] the door" open and "almost immediately" the man pushed his way inside the apartment (SA 55-56, 59-61; 7/26/21 Tr. 371-72, 375-77). Talley heard the man yelling in an "aggressive" manner and the young woman screaming (SA 55-56, 58; 7/26/21 Tr. 371-72, 374). Talley continued to her apartment and called 911 at 10:44 a.m. (SA 56, 61-62, 331; 7/26/21 Tr. 372, 377-78; 7/28/21 Tr. 800).

11

B.P. was in her apartment talking on FaceTime with another man, when her dog began acting strangely as if somebody was at the door (SA 148-54, 250-51; 7/27/21 Tr. 499-505, 621-22). B.P. got off the phone, went to the door, and looked through the peephole but did not see anyone (SA 154-56; 7/27/21 Tr. 505-07). B.P. opened the door to check to see if anyone was in the hallway (SA 156; 7/27/21 Tr. 507). When she opened the door, Green-Remache pushed through the door and into her apartment (SA 156; 7/27/21 Tr. 507). B.P. did not invite him into her home (SA 156; 7/27/21 Tr. 507). Upon entering the apartment, Green-Remache grabbed B.P. by the neck, pinned her down on the couch, choked her, and punched her body and head (SA 166-70; 7/27/21 Tr. 517-21).[7]

---

[7] At trial, B.P. testified that Green-Remache had her permission to enter the apartment, he did not choke her, and she hit him first (SA 154-55, 157, 161-69, 252-53, 256; 7/27/21 Tr. 505-06, 508, 512-20, 623-24, 627). B.P. was impeached with prior inconsistent statements she made to: (1) the 911 dispatcher that Green-Remache pushed through the door and started beating on her (SA 44, 158-60, 179, 299; 7/27/21 Tr. 509-11, 530, 672; GX 106); (2) Metropolitan Police Department (MPD) Detective Figueroa that Green-Remache pushed her onto the couch, choked her, and punched her 10 to 12 times (SA 45, 160, 164-66, 299; 7/27/21 Tr. 511, 515-17, 672; GX 108 at 2:00-2:45); (3) Prince Georges (PG) County Detective Pierce that when she opened her door, Green-Remache rushed through it and immediately started choking her and hitting her (SA 46, 170-75, 299; 7/27/21 Tr. 521-26, 672; GX 109 at 5:29-6:00); and (4) the

(continued . . . )

During the alteration, Berry came out of her room and tried to separate B.P. and Green-Remache (SA 183-84; 7/27/21 Tr. 534-35).[8] Eventually they did separate, and Green-Remache told B.P. that she "need[ed] to answer some questions now" and that she could either do so in her apartment or outside (SA 184-190; 7/27/21 Tr. 535-41). B.P. thought it would be better to answer his questions outside, given that there were knives and other potential weapons in the apartment (SA 191-92, 201-02; 7/27/21 Tr. 542-43, 552-53). Green-Remache grabbed her wrist – "kind of in, like, a cuff" – and "guided her out the door" (SA 193-94; 7/27/21 Tr. 544-45). Green-Remache held B.P. by the wrist as he walked out the door "to make sure [she] wasn't going anywhere too far" (SA 194-196; 7/27/21 Tr. 545-47).[9] Before she left her apartment, Berry

---

SANE that Green-Remache "shoved his way" into her apartment (SA 175-76; 7/27/21 Tr. 526-27).

[8] B.P. testified that she is 5' 2" tall (SA 179-80; 7/27/21 Tr. 530-31). Berry testified that she is 5' 1" tall (SA 74; 7/26/21 Tr. 390). The CPO lists Green-Remache's height and weight as 5' 11" tall and 150 pounds (AA 311).

[9] At trial, B.P. denied that she had been abducted by Green-Remache (SA 269; 7/27/21 Tr. 642). She testified that she voluntarily left the apartment and drove to Maryland with Green-Remache (SA 185-86, 191-97, 200-02, 257-59, 262-65; 7/27/21 Tr. 536-37, 542-48, 551-53, 628-30, 633-36). B.P. was impeached with her prior inconsistent statements to two different

(continued . . . )

asked B.P. if she wanted Berry to call the police and B.P. said yes (SA 192, 197-98; 7/27/21 Tr. 543, 548-49).[10]

Green-Remache and B.P. went outside to where Green-Remache's car was parked (SA 196-97, 202, 326-27; 7/27/21 Tr. 547-48, 553, 738-39). B.P. noticed parked police cars but did not see anyone in them (SA 203-05; 7/27/21 Tr. 554-56). Green-Remache ordered B.P. not to run or scream and threatened to kill her and himself if she did (SA 204-05 7/27/21 Tr. 555-56). B.P. complied and got into Green-Remache's car (SA 196-97, 205; 7/27/21 Tr. 547-48, 556). B.P. did not know where he was taking her, which frightened her (SA 206-07; 7/27/21 Tr. 557-58). Green-Remache stopped at a 7-Eleven in Fort Washington, Maryland (SA 205-07, 316, 323-24; 7/27/21 Tr. 556-58, 727, 735-36). While they were discussing their relationship, a police car pulled up right beside them, and Green-Remache pulled off and drove to a nearby school, Potomac Landing

---

detectives that Green-Remache grabbed her and forced her out the door (SA 45-46, 198-200; 7/27/21 Tr. 549-51, 672; GX 108 at 2:55 to 3:18; GX 109 at 6:25 to 6:30).

[10] At trial, B.P. claimed that she wanted Berry to call the police because she was frustrated with Green-Remache and wanted to get him into trouble, and not because she feared him (SA 193, 208, 260; 7/27/21 Tr. 544, 559, 631).

Elementary School, in Fort Washington (SA 206-09, 316, 324-25; 7/27/21 Tr. 557-60, 727, 736-37).

When Green-Remache reached the back of the school, he told B.P. to get in the back seat of the car, and B.P. complied (SA 212-13, 316-17; 7/27/21 Tr. 563-64, 727-28). Green-Remache grabbed a screwdriver from the back seat pocket, held the screwdriver to B.P.'s neck, and stated, "[T]ake your clothes off or this is going up in you" (SA 214-16, 219, 223; 7/27/21 Tr. 565-67, 570, 574). B.P. did as she was told because she did not want Green-Remache to hurt her (SA 219, 223; 7/27/21 Tr. 570, 574). Green-Remache told B.P. to turn over, and he tried to penetrate her vaginally from behind, but he could not do so because his penis was not hard (SA 219, 224; 7/27/21 Tr. 570, 575). Green-Remache held the screwdriver to the back of B.P.'s head and ordered her to give him oral sex (SA 219; 7/27/21 Tr. 570).[11] Green-Remache then told B.P. to turn around, and he had vaginal sex with B.P. from behind (SA 224-25; 7/27/21 Tr. 575-76). B.P. cried while she was having sex with Green-Remache (SA

---

[11] This screwdriver was recovered from the rear pocket of the passenger's seat of Green-Remache's car on April 13, 2020, and admitted into evidence (SA 215-16, 231-33, 300, 321-22, 331-32; 7/27/21 Tr. 566-67, 582-84, 673, 733-34; 7/28/21 Tr. 800-01).

219; 7/27/21 Tr. 570).[12] After Green-Remache ejaculated, he told B.P. to get back in the front seat (SA 224; 7/27/21 Tr. 575). B.P. used napkins to wipe herself and threw the napkins out the window (SA 225-26, 266-67, 317-18; 7/27/21 Tr. 576-77, 639-40, 728-29).[13]

On their drive back to B.P.'s apartment, B.P. and Green-Remache started to argue again (SA 226-28; 7/27/21 Tr. 577-79). It was raining outside, and Green-Remache was driving on the highway (SA 228; 7/27/21 Tr. 579). As he swerved his car into other lanes, Green-Remache asked B.P. whether she was ready to die and stated that he thought it was their time to die (SA 227-28; 7/27/21 Tr. 578-79). B.P. felt scared, so

---

[12] At trial, B.P. denied that Green-Remache raped her (SA 269; 7/27/21 Tr. 642). She claimed that she consented to sex and that Green-Remache did not use a screwdriver to force her to have sex with him (SA 211-13, 219-20, 266; 7/27/21 Tr. 562-64, 570-71, 639). B.P. was impeached with her prior inconsistent statements to the 911 dispatcher that Green-Remache put a screwdriver to her neck and made her take off all her clothes and have sex with him (SA 44, 220, 272, 299; 7/27/21 Tr. 571, 645, 672; GX 106 at 2:31 to 2:48); and to two detectives that Green-Remache raped her (SA 45-46, 220-22, 234, 299; 7/27/21 Tr. 571-73, 593, 672; GX 108 at 4:21 to 4:25; GX 109 at 9:15 to 10:50).

[13] Police recovered two napkins from the ground behind Potomac Landing Elementary School (SA 317, 335; 7/27/21 Tr. 728; 7/28/21 Tr. 804). An FBI forensic examiner obtained both male and female DNA from these napkins and concluded that this DNA originated from B.P. and Green-Remache (SA 335-36; 7/28/21 Tr. 804-05).

she tried to calm Green-Remache down by telling him that she had a headache and asking him to get some medicine for her (SA 228-29; 7/27/21 Tr. 579-80). Green-Remache stopped at a store to buy B.P. medicine and then drove her home (SA 226-27, 240; 7/27/21 Tr. 577-78, 609).[14]

Berry testified that, at around 10:45 a.m., she was in her bedroom sleeping, when she was awakened by "a loud bang" at the door (the sound of someone "bust[ing] through the door") and the dog barking (SA 68, 86, 88-89; 7/26/21 Tr. 384, 402, 404-05). Berry went straight to the living room and saw Green-Remache, whose back was facing her, swinging at B.P., who was on the couch in front of Green-Remache (SA 68-83, 91; 7/26/21 Tr. 384-99, 407). Berry described how Green-Remache pulled his

---

[14] An expert in the field of historical cellular record analysis analyzed the call detail records and cell site information for Green-Remache's cell phone on April 12, 2020, to determine the general location of the cell phone during the time of the incident (SA 302-10; 7/27/21 Tr. 675, 683, 690-93, 697-98, 703). At 10:26 a.m., Green-Remache's cell phone used a tower in the vicinity of B.P.'s apartment building, and at 11:31 a.m., his cell phone used a tower near Fort Washington, Maryland, showing the movement of the cell phone from D.C. to Maryland in that time frame (SA 311-13; 7/27/21 Tr. 705-07). Green-Remache's cell phone then moved from Maryland back to D.C., and more specifically, near B.P.'s apartment shortly after 1:00 p.m. (SA 313-14; 7/27/21 Tr. 707-08).

arm back and swung forward with a closed fist at B.P. (SA 69-70, 91; 7/26/21 Tr. 385-86, 407). Berry did not see where Green-Remache struck B.P., but when B.P. got up, Berry noticed redness in B.P.'s lower neck, upper shoulder, and clavicle (SA 70-71, 91; 7/26/21 Tr. 386-87, 407).

Green-Remache was yelling at B.P., "[C]ome on, I'm about to leave," and "kind of . . . manhandling her, trying to get her to get up and go out the door" (SA 69-70; 7/26/21 Tr. 385-86). He picked up B.P.'s phone and her shoes and grabbed B.P. around the waist to try to get her out the door (SA 70-72, 89; 7/26/21 Tr. 386-88, 405). Berry tried to separate the two and get B.P. away from Green-Remache (SA 70, 83; 7/26/21 Tr. 386, 399). Berry asked B.P. if she wanted her to call the police, and B.P. indicated yes (SA 70, 73-74; 7/26/21 Tr. 386, 389-90). Green-Remache kept trying to pull B.P. out the door, but B.P. was "hanging on to the inside of the door," trying to stay inside the apartment (SA 70-74; 7/26/21 Tr. 386-90). B.P. told Green-Remache to "get off of [her]" and "calm down," and mentioned to Berry that she was going to go with Green-Remache so she could try to get him to calm down (SA 72; 7/26/21 Tr. 388).[15] B.P. grabbed

---

[15] At some point, Berry heard B.P. say, "Okay, I'll go" (SA 90; 7/26/21 Tr. 406). When B.P. made this statement, Green-Remache was still pulling

(continued . . . )

her sweater and went out (SA 70, 72, 90; 7/26/21 Tr. 386, 388, 406). After B.P. and Green-Remache left the apartment, Berry called 911 at 10:52 a.m. (SA 75, 91, 331; 7/26/21 Tr. 391, 407; 7/28/21 Tr. 800).

Later that day, B.P. texted Berry to let her know that she was on her way back (SA 75-76, 91-92, 268, 270; 7/26/21 Tr. 391-92, 407-08; 7/27/21 Tr. 641, 643). When B.P. returned home, B.P. had bruises on her, was "literally shaking" and trembling, did not want to be touched, and was about to cry (SA 77-79; 7/26/21 Tr. 393-95). B.P. told Berry that she had been raped (SA 77; 7/26/21 Tr. 393). With Berry's encouragement, B.P. called the police (SA 77, 92, 240-41, 270-71; 7/26/21 Tr. 393, 408; 7/27/21 Tr. 609-10, 643-44). B.P. initially did not want to go to the hospital, but Berry and the detectives on the scene convinced her to go and get a rape kit done (SA 80, 92-95, 238, 270-71; 7/26/21 Tr. 396, 408-11; 7/27/21 Tr. 597, 643-44).

The following day, on April 13, 2023, B.P. went to Prince Georges Hospital Center to get a sexual assault examination (SA 100-02, 395;

---

on her and "calling her all types of bitches and hoes" (SA 95-96; 7/26/21 Tr. 411-12). Berry explained that B.P. only agreed to go with him because she was trying to get him to calm down, but B.P. was "reluctant, absolutely reluctant" to go (SA 95-96; 7/26/21 Tr. 411-12).

7/26/21 Tr. 419-21; 7/28/21 Tr. 884). Rebekah Solomon, a forensic nurse examiner, conducted B.P.'s examination (SA 397-98; 7/28/21 Tr. 888-89). Solomon observed abrasions and lacerations on B.P.'s neck and upper chest and bruising along her trachea, as well as injuries to B.P.'s back (SA 402-11; 7/28/21 Tr. 893-902). During the examination, Solomon took perivaginal and vaginal swabs from B.P. (SA 333-34, 413-17; 7/28/21 Tr. 802-03, 904-08). An FBI forensic examiner obtained both male and female DNA from these swabs and concluded that this DNA originated from B.P. and Green-Remache (SA 334-35; 7/28/21 Tr. 803-04).

After Green-Remache was arrested, he was detained at the D.C. Jail (SA 102; 7/26/21 Tr. 421). While incarcerated at the D.C. Jail, Green-Remache placed numerous collect calls to B.P. from May 8, 2020, through July 5, 2020, which B.P. accepted (SA 103-15, 235-36, 279-80; 7/26/21 Tr. 422-34; 7/27/21 Tr. 594-95, 652-53). The calls were recorded, and portions of the recordings were admitted into evidence and played for the jury (SA 103-15, 392 7/26/21 Tr. 422-34; 7/28/21 Tr. 881).

In one call placed on May 8, 2020, B.P. asks Green-Remache, "What made you call me?," and Green-Remache responds that he called to apologize to her  (SA 47, 107-08, 281-82; 7/26/21 Tr. 426-27; 7/27/21 Tr.

654-55; GX 700A at 00:01 to 00:40). B.P. then asks Green-Remache, "Why you do that to me?," and Green-Remache answers, "I didn't want to let you go" (SA 47, 423; 7/28/21 Tr. 985; GX 700A at 01:07 to 01:22). B.P. ultimately accepts Green-Remache's apology (SA 47, 281-82, 424; 7/27/21 Tr. 654-55; 7/28/21 Tr. 986; GX 700A at 05:02 to 05:05). B.P. tells Green-Remache, "When you get angry, you're scary. It's scary and I don't know what you are capable of," and Green-Remache states, "I was mad, and I wanted you to see that I was mad" (SA 47, 424; 7/28/21 Tr. 986; GX 700A at 07:19 to 08:06). At the end of the call, B.P. and Green-Remache say to each other, "I love you" (SA 47, 424; 7/28/21 Tr. 986; GX 700A at 14:33 to 14:39).

### 3.   Dr. Chitra Raghavan

Dr. Chitra Raghavan testified as an expert in coercive control and traumatic bonding in the context of domestic violence (SA 339, 373-74; 7/28/21 Tr. 808, 842-43). Dr. Raghavan made clear that she was "testifying on theory and research and frameworks" used to understand domestic violence; she was not testifying on "any particular behaviors" exhibited by the defendant or the victim in the instant case, nor was she trying to diagnose them (SA 375, 390-91; 7/28/21 Tr. 844, 879-80).

Dr. Raghavan explained that "coercive control" is a term used by psychologists to refer to abuse dynamics – i.e., different tactics used by abusers to achieve control over their victims (SA 376; 7/28/21 Tr. 845). The object of coercive control is to rob the victim of power so that there is a chronic power imbalance in the relationship and all the power lies in the hands of the abuser (SA 377-78; 7/28/21 Tr. 846-47). This chronic power imbalance harms the victim by making her unable to make decisions that benefit herself (SA 378; 7/28/21 Tr. 847). The goal of the abuser is to make the victim submissive and obedient so that she stays with him on his terms (SA 380; 7/28/21 Tr. 849). The tactics used by an abuser to achieve coercive control over a victim include physical violence, sexual violence, emotional abuse, manipulation, blackmail, or deception (SA 376, 378; 7/28/21 Tr. 845, 847).

Dr. Raghavan further explained that expressions of love and contrition are very important in a coercive control relationship (SA 380-50; 7/28/21 Tr. 849-50). They are the glue that keeps the victim in an abusive relationship and are a part of the "cycle of violence" (SA 377, 381; 7/28/21 Tr. 846, 850) After an abuser physically or emotionally abuses the victim, the abuser apologizes, begs for forgiveness, makes promises

to change, and heaps affection on the victim (SA 377; 7/28/21 Tr. 846). While apologizing and professing love toward the victim, the abuser asks the victim to take responsibility for her role in causing the abuse as well, even though the responsibility lies entirely with him (SA 377; 7/28/21 Tr. 846). Dr. Raghavan opined that, in coercive control relationships, it is very common to see breakups followed by reconciliation and a resumption of the relationship (SA 381; 7/28/21 Tr. 850)

Dr. Raghavan discussed research showing that breaking up in a coercive control relationship is a process and takes approximately five to seven attempts (SA 381; 7/28/21 Tr. 850). When an abuser feels that he is losing control over the victim, the abuser will increase the severity of the tactic that he finds most effective in controlling the victim (SA 382; 7/28/21 Tr. 851). For instance, an abuser might increase the level of violence or threats, or he might increase the level of isolation or restrictions (SA 382; 7/28/21 Tr. 851).

Dr. Raghavan also testified that when a victim in a coercive control relationship reports the abuser to law enforcement in an attempt to break away from him, initially the victim may feel a sense of relief or empowerment (SA 383; 7/28/21 Tr. 852). But those feelings soon dissipate

and are followed by guilt, shame, or fear about making that police report (SA 383, 386-87; 7/28/21 Tr. 852, 855-56). To overcome these intense feelings of guilt, shame, or fear, the victim attempts to protect the abuser (SA 383-84, 386-87; 7/28/21 Tr. 852-53, 855-56). The victim might try to repair the situation by trying to get the charges dropped, recanting her allegations, lying about what happened, refusing to come to court, evading a subpoena, or testifying on behalf of the abuser (SA 387; 7/28/21 Tr. 856).

In Dr. Raghavan's experience, at the beginning stages of the breakup process, the victim almost always protects the abuser over her own safety and interests (SA 383-84; 7/28/21 Tr. 852-53). To an outsider, the victim's behavior appears irrational, illogical, and self-destructive, but, according to Dr. Raghavan, it is easily explained by trauma (SA 384, 386; 7/28/21 Tr. 853, 855). The term "traumatic bonding" or "trauma bonding" describes the victim's unhealthy dependency on the abuser that is created by coercive control (SA 384; 7/28/21 Tr. 853). Depending on the intensity of the abuse, the vulnerability of the victim, or the length of the relationship, the traumatic bond can become very strong – to the extent that the victim feels like she is nothing without her abuser, has no

internal sense of herself, and can see no other perspective but his (SA 384-85; 7/28/21 Tr. 853-54). The victim feels responsible for the abuser and believes that it is her fault if there is abuse or violence in the relationship (SA 384-85; 7/28/21 Tr. 853-54). The victim will often defend her abuser to others, feel empty or lost without him, and repeatedly return to him, even if family and friends provide her with the support necessary to leave the abusive relationship (SA 386; 7/28/21 Tr. 855).

Dr. Raghavan discussed a study examining jail calls made by incarcerated abusers to their wives or girlfriends (SA 387-88; 7/28/21 Tr. 856-57). The study revealed three different tactics abusers used to manipulate their victims into lying, recanting, or dropping charges (SA 388; 7/28/21 Tr. 857). First, the abusers tried to create a sense of guilt and shame (SA 388; 7/28/21 Tr. 857). Second, they emphasized how much they loved the victims and reminded the victims of their romantic beginnings before the violence began (SA 388; 7/28/21 Tr. 857). Third, if the first two methods failed, they threatened the victims (SA 388; 7/28/21 Tr. 857). The study further showed, and Dr. Raghavan's own clinical work confirmed, that as the trial date approached, the amount of manipulation, despair, begging, and threatening by the abusers

25

increased (SA 389; 7/28/21 Tr. 858). As the pressure on the victims increased, they started to second-guess their original reports and feel less confident about going forward with their cases (SA 389; 7/28/21 Tr. 858).[16]

## SUMMARY OF ARGUMENT

The existing record conclusively shows that Green-Remache is not entitled to relief on his claim, raised for the first time on direct appeal, that his trial counsel was ineffective in failing to object to the admission of Dr. Raghavan's expert testimony.

First, Green-Remache has failed to allege a colorable claim that his trial counsel was constitutionally deficient in failing to challenge the admission of this expert testimony. Particularly given the numerous federal cases upholding the admission of expert testimony on domestic violence and victim recantation, Green-Remache's counsel would have had no basis to challenge the admission of Dr. Raghavan's testimony. Thus, trial counsel's failure to do so cannot constitute constitutionally deficient performance.

---

[16] The defense did not present any evidence (SA 418; 7/28/21 Tr. 919).

Second, Green-Remache has failed to allege a colorable claim that he was prejudiced by his counsel's alleged deficiency. There is no reasonable probability that, had counsel objected to Dr. Raghavan's testimony, the district court would have excluded the testimony. Moreover, even without Dr. Raghavan's testimony, there was overwhelming evidence of guilt, including B.P.'s sworn grand-jury testimony recounting in detail Green-Remache's conduct, the marks of abuse on her body observed shortly after the offense, the jail calls, and especially the testimony of B.P.'s neighbor and roommate. This Court can conclusively find on this record that, even if counsel were deficient in allowing Dr. Raghavan's testimony, there is no reasonable probability the trial would have turned out differently. A remand for an evidentiary hearing is therefore not required.

## ARGUMENT

### The Trial Record Conclusively Shows That Green-Remache Cannot Sustain His Ineffectiveness Claim.

The sole contention Green-Remache raises in his direct appeal is that his trial counsel's failure to challenge the admission of Dr. Raghavan's expert testimony violated his Sixth Amendment right to

27

effective assistance of counsel (Brief for Green-Remache at 26, 29, 33-34). Notably, Green-Remache does not contend that he is entitled to relief upon the basis of the existing record; he only asks this Court to remand his case "for further factual inquiry" on his ineffectiveness claim (*id.* at 29, 34-48). Green-Remache has not suggested what facts he would seek to develop on remand or explained why the current record is inadequate. Remand is not required because the present record conclusively establishes that Green-Remache cannot establish an ineffectiveness claim. Accordingly, this Court should affirm his conviction for interstate violation of a protection order.

## A.   Standard of Review and Applicable Legal Principles

A defendant's claim of ineffective assistance of counsel is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed, the defendant must show that (1) counsel's representation was deficient, and (2) counsel's deficient performance prejudiced him. *Id.* at 687. Failure to meet either requirement defeats the ineffectiveness claim. *Id.* at 700.

The deficiency component of *Strickland* requires a showing that counsel's performance "fell below an objective standard of reasonableness." 466 U.S. at 688. The defendant's burden is a heavy one,

28

because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The Supreme Court has cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential," and judges must make "every effort" to "eliminate the distorting effects of hindsight." *Id.* at 689.

To satisfy *Strickland*'s prejudice requirement, the defendant must show that counsel's errors were "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." 466 U.S. at 687. It is not enough for the defendant to show that the errors "had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, he must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.*

Rule 702 of the Federal Rules of Evidence imposes upon trial judges "a basic gatekeeping obligation" to ensure that all expert testimony admitted is "'not only relevant, but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow*

29

*Pharm., Inc.*, 509 U.S. 579, 589 (1993)). To satisfy Rule 702's "standard of evidentiary reliability," "that is, trustworthiness," the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 590 n.9, 592-93. Rule 702 also includes a relevance requirement, providing that expert testimony is admissible if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Where, as here, a claim of ineffective assistance of counsel is brought for the first time on direct appeal, this Court "must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose." *Massaro v. United States*, 538 U.S. 500, 504-05 (2003). Accordingly, "this [C]ourt's 'general practice is to remand the claim for an evidentiary hearing' unless 'the trial record alone conclusively shows' that the defendant either is or is not entitled to relief." *United States v. Rashad*, 331 F.3d 908, 909-10 (D.C. Cir. 2003) (quoting *United States v.*

30

*Fennell*, 53 F.3d 1296, 1303-04 (D.C. Cir. 1995)). "The critical inquiry at this stage is whether the record conclusively demonstrates that [the defendant] could not establish an ineffective assistance of counsel claim if given the opportunity to do so on remand." *United States v. Browne*, 953 F.3d 794, 804 (D.C. Cir. 2020) (citing *Rashad*, 331 F.3d at 912). "In short, all that is required for a remand is 'a colorable and previously unexplored claim of ineffective assistance.'" *United States v. Murray*, 897 F.3d 298, 310 (D.C. Cir. 2018) (quoting *Rashad*, 331 F.3d at 908).

## B. Discussion

Green-Remache's ineffectiveness claim does not warrant a remand because the record conclusively establishes that Green-Remache cannot show either deficiency or prejudice in his trial counsel's failure to object to Dr. Raghavan's testimony.

*First*, the record conclusively demonstrates that counsel's performance was not deficient. Green-Remache does not challenge Dr. Raghavan's qualifications on appeal; nor does he challenge the reliability of the reasoning or methodology underlying Dr. Raghavan's testimony. Rather, he contends that that the reasoning or methodology used by Dr. Raghavan was not reliably applied to the facts of this case because Dr.

Raghavan did not interview the victim, did not review any underlying reports or statements, and "knew nothing about the case" (Brief for Green-Remache at 5, 36, 38).

Rule 702's requirement that an expert "reliably appl[y] the principles and methods to the facts of the case," Fed. R. Evid. 702(d), does not mean that, for Dr. Raghavan's testimony to be admissible, she had to opine on whether B.P. had developed traumatic bonds with Green-Remache and recanted her allegations. Indeed, had Dr. Raghavan done so, she would have invaded "the jury's prerogative to determine credibility." *United States v. Torres*, 894 F.3d 305, 311 (D.C. Cir. 2018) (internal quotation marks and citations omitted).

Contrary to Green-Remache's assertions, the mere fact that Dr. Raghavan testified in general terms about characteristics of abusive relationships and common behaviors of domestic violence victims does not render her testimony inadmissible under Rule 702. In the context of domestic violence cases, federal courts of appeals have routinely upheld the admission of generalized expert testimony discussing the dynamics of abusive relationships to explain victim recantation, even where, as here, the expert has never met with the victim or reviewed any

32

underlying documents related to the case. *See, e.g., United States v. LaVictor*, 848 F.3d 428, 440-44 (6th Cir. 2017) (in prosecution of defendant for sexual abuse of girlfriend who had since recanted her accusations, district court did not abuse its discretion in admitting expert testimony on victim recantation in domestic violence cases, even though expert had never met with victim or reviewed any evidence in connection with the case); *United States v. Vasquez*, 729 F. App'x 383, 384-87 (6th Cir. 2018) (finding no plain error in allowing social worker, who had never met victim, to testify "generally about characteristics and behaviors typical of victims of domestic violence," including lying to cover up the abuse, to provide explanation for victim's contradictory testimony at trial recanting her previous accusations of abuse by defendant); *Thomas v. Lampert*, 349 F. App'x 272, 278 (10th Cir. 2009) ( "For years, federal courts have allowed experts to offer their opinions regarding battered woman's syndrome to explain the contradictory testimony of victims of abuse.") (citing cases).

Green-Remache further claims that the jury did not need Dr. Raghavan's opinions to understand the evidence – i.e., her testimony was "unrelated to," and did not fit, the facts of this case and "addressed

33

matters that the jur[ors] could have reached with their own common knowledge and common sense" (Brief for Green-Remache at 26-27, 36-40). But federal courts have repeatedly held that expert testimony like Dr. Raghavan's is beyond the reach of the average juror and helpful in understanding a victim's recantation. *See LaVictor*, 848 F.3d at 442-43 ("An overwhelming number of federal courts accept that the dual phenomenon of battered woman's syndrome and victim recantation are beyond the knowledge of an average juror, and therefore allow expert witnesses to offer testimony in such cases.") (listing cases); *Vasquez*, 729 F. App'x at 385, 387 (general expert testimony on characteristics and behaviors typical of domestic violence victims "was helpful to the jury because it would help jurors make sense of a victim's contradictory testimony").

The cases cited by Green-Remache to support his assertion that Dr. Roghavan's testimony was inadmissible because she "neither examined the alleged victim nor read any of the underlying records" are readily distinguishable (see Brief for Green-Remache at 36-39). They do not involve expert testimony on the dynamics of abusive relationships to help explain recantation by domestic violence victims. Rather, *United States*

34

*v. Raymond*, 700 F. Supp. 2d 142 (D. Me. 2010), and *United States v. Schneider*, 2010 WL 3734055 (E.D. Pa. Sept. 22, 2010), both involve expert testimony on general behavioral patterns of child molesters and characteristics of child victims. The district courts in these cases held that this testimony was inadmissible under Fed. R. Evid. 702 because the proffered expert opinions on grooming practices and delayed disclosure by child witnesses were based on common sense and were not beyond the reach of the average juror, and therefore they would not assist the jury in understanding the evidence. *See Raymond*, 700 F. Supp. 2d at 149-52; *Schneider*, 2010 WL 3734055, at *5-*7 (E.D. Pa. Sept. 22, 2010). Unlike these cases, however, federal courts have repeatedly held that admission of generalized expert testimony on domestic violence and victim recantation is beyond the ken of the average juror and would assist the jury in understanding the evidence.

Accordingly, Green-Remache's counsel did not have any basis to challenge the admission of Dr. Raghavan's testimony. Thus, trial counsel's failure to object to the admission of this testimony cannot be deemed constitutionally deficient, and Green-Remache has failed to

35

allege a colorable claim of ineffective assistance to warrant an evidentiary hearing.

*Second*, the record conclusively shows that counsel's failure to object to Dr. Raghavan's testimony did not prejudice Green-Remache.[17] To start, given the consistent case law that this kind of expert testimony is admissible in domestic-violence cases, *see supra* at pp. 32-34, there is no reasonable probability that, had trial counsel objected, the district court would have excluded Dr. Raghavan's testimony.

In any event, the record conclusively shows that, even without Dr. Raghavan's testimony, there is no reasonable probability of a different verdict. The jury still would have heard B.P.'s sworn GJ testimony detailing what happened. Although B.P. told a different story at trial, she was impeached with her statements to multiple people soon after the incident, including the 911 dispatcher, two different detectives, and the

---

[17] At one point in his brief, Green-Remache argues that his trial counsel's alleged error was harmless (Brief for Green-Remache at 46-47). However, he also acknowledges that claims of ineffective assistance of counsel are governed by *Strickland*, which requires him to demonstrate a reasonable probability that but for counsel's errors the result of the proceeding would have been different (*id.* at 29-30). For the reasons set forth above, Green-Remache cannot make a colorable claim of *Strickland* prejudice.

SANE. *See supra* notes 4, 7, 9, 12. B.P.'s explanation for why she had lied to these people – that she was mad at Green-Remache and felt like she had to keep up the lies (SA 243, 245, 253, 274-75; 7/27/21 Tr. 614, 616, 624, 647-48) – was questionable on its face and did not explain why she had not come clean when she testified under oath before the grand jury and had the opportunity to do so (SA 176-77, 275-78, 292-96; 7/27/21 Tr. 527-28, 648-51, 665-69).

Moreover, there was overwhelming evidence that the version of the events that B.P. told the grand jury was true. The SANE who examined B.P. the next day saw visible signs of the assault – i.e., abrasions, lacerations, and bruising – on her neck, throat, upper chest, and back (SA 402-411; 7/28/21 Tr. 893-902). Green-Remache's call to B.P. from jail seeking to apologize to her further corroborates B.P.'s grand jury testimony. B.P.'s accusatory question to Green-Remache, "Why you do that to me?," and her remark that Green-Remache was scary when he got angry, as well as Green-Remache's admissions that he "didn't want to let [her] go" and that he was "mad," reinforce the credibility of B.P.'s initial account of the incident (GX 700A at 00:01 to 00:40, 01:07 to 01:22, 07:19 to 08:06).

The testimony of B.P.'s neighbor, Talley, and B.P.'s roommate, Berry, particularly defeat Green-Remache's prejudice claim. Their testimony not only corroborated B.P.'s version of the events inside the apartment that she had provided to the grand jury, but also provided independent evidence of guilt.

Talley, an unbiased witness who did not know either B.P. or Green-Remache, testified that she saw a man walk to the apartment located two doors away from hers; a young woman "crack[ ] the door" of that apartment open; and "almost immediately" the man pushed his way inside (SA 52-56, 59-61; 7/26/21 Tr. 368-72, 375-77). Talley then heard the man yelling aggressively and the young woman screaming (SA 55-56, 58; 7/26/21 Tr. 371-72, 374).

Berry's testimony picked up almost immediately where Talley's left off. Berry testified that she was awakened by "a loud bang" at the door, which sounded like someone "bust[ing] through the door" (SA 68, 86, 88-89; 7/26/21 Tr. 384, 402, 404-05). Berry went straight to the living room and saw Green-Remache, whose back was facing her, punching B.P., who was on the couch in front of him (SA 68-70, 73-83, 91; 7/26/21 Tr. 384-86, 389-99, 407). Green-Remache yelled to B.P. that he was about to leave

and grabbed B.P. around the waist to try to get her out the door (SA 69-72, 89; 7/26/21 Tr. 385-88, 405). Green-Remache kept trying to pull B.P. out the door, but B.P. was "hanging on to the inside of the door," trying to stay inside the apartment (SA 70-74; 7/26/21 Tr. 386-90). At some point, Berry heard B.P. say, "Okay, I'll go," but B.P. indicated to Berry that she was only going with Green-Remache so she could try to get him to calm down (SA 90, 95-96; 7/26/21 Tr. 406, 411-12). According to Berry, B.P. was "reluctant, absolutely reluctant to go" with him (SA 95-96; 7/26/21 Tr. 411-12).

Green-Remache did not dispute at trial that he left the apartment with B.P. and travelled to Maryland with her; nor did he dispute the terms or the validity of the CPO in effect on April 12, 2020 (SA 336-37, 420-21; 7/28/21 Tr. 805-06, 945-46). Thus, Talley's and Berry's eyewitness descriptions of Green-Remache forcefully pushing his way into her apartment; repeatedly punching B.P. while she was seated on the couch and he was standing over her; and grabbing B.P. by the waist and trying to pull her out the door as she held on to the inside of the door established that Green-Remache was guilty of interstate violation of a protection order – i.e., that he caused B.P. to travel in interstate commerce by force;

and in the course of causing B.P. to travel in interstate commerce by force, he violated the CPO by assaulting her. *See United States v. Helem*, 186 F.3d 449, 454-55 (4th Cir. 1999) (construing "parallel" provision of 18 U.S.C. § 2261(a)(2) and holding that violence that occurs before interstate travel begins can satisfy the "in the course or as a result of that conduct" requirement of 18 U.S.C. § 2261(a)(2); finding that defendant satisfied the "in the course . . . of that conduct" requirement by beating his wife in their apartment before traveling with her in interstate commerce; the beating frightened her into submission, enabling defendant to force wife across state lines).

In sum, given all the evidence of guilt even without Dr. Raghavan's testimony, there is no reasonable probability that the outcome of the trial would have been different had defense counsel objected to the expert's testimony. *See United States v. Sitzmann*, 893 F.3d 811, 831-33 (D.C. Cir. 2018) (noting compelling nature of government's case and finding that overwhelming evidence of guilt forecloses any colorable inference of prejudice under *Strickland*). And because the record conclusively demonstrates that Green-Remache could not establish prejudice if given the opportunity to do so, there is no basis to remand for an evidentiary

40

hearing. *See id.* at 833 (declining to remand where no colorable ineffectiveness claim).

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
ELIZABETH H. DANELLO
KIMBERLY L. PASCHALL
RYAN H. CREIGHTON
EMORY V. COLE
Assistant United States Attorneys

_____/s/_____
ANNE Y. PARK
D.C. Bar #461853
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Anne.Park@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 8,793 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/

ANNE Y. PARK
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant Joey Green-Remache, Stephen C. Leckar, Esq., sleckar@kalbianhagerty.com, on this 24th day of July, 2023.

/s/

ANNE Y. PARK
Assistant United States Attorney

# ADDENDUM

# ADDENDUM INDEX

18 U.S.C. § 2261 ...................................................................... A-1

18 U.S.C. § 2262 ...................................................................... A-3

Fed. R. Evid. 702 .................................................................... A-6

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 110A. Domestic Violence and Stalking

18 U.S.C.A. § 2261

§ 2261. Interstate domestic violence

Effective: October 1, 2013
Currentness

**(a) Offenses.--**

**(1) Travel or conduct of offender.**--A person who travels in interstate or foreign commerce or enters or leaves Indian country or is present within the special maritime and territorial jurisdiction of the United States with the intent to kill, injure, harass, or intimidate a spouse, intimate partner, or dating partner, and who, in the course of or as a result of such travel or presence, commits or attempts to commit a crime of violence against that spouse, intimate partner, or dating partner, shall be punished as provided in subsection (b).

**(2) Causing travel of victim.**--A person who causes a spouse, intimate partner, or dating partner to travel in interstate or foreign commerce or to enter or leave Indian country by force, coercion, duress, or fraud, and who, in the course of, as a result of, or to facilitate such conduct or travel, commits or attempts to commit a crime of violence against that spouse, intimate partner, or dating partner, shall be punished as provided in subsection (b).

**(b) Penalties.**--A person who violates this section or section 2261A shall be fined under this title, imprisoned--

**(1)** for life or any term of years, if death of the victim results;

**(2)** for not more than 20 years if permanent disfigurement or life threatening bodily injury to the victim results;

**(3)** for not more than 10 years, if serious bodily injury to the victim results or if the offender uses a dangerous weapon during the offense;

**(4)** as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and

**(5)** for not more than 5 years, in any other case,

or both fined and imprisoned.

A-1

**(6)** Whoever commits the crime of stalking in violation of a temporary or permanent civil or criminal injunction, restraining order, no-contact order, or other order described in section 2266 of title 18, United States Code, shall be punished by imprisonment for not less than 1 year.

## CREDIT(S)

(Added Pub.L. 103-322, Title IV, § 40221(a), Sept. 13, 1994, 108 Stat. 1926; amended Pub.L. 104-201, Div. A, Title X, § 1069(b)(1), (2), Sept. 23, 1996, 110 Stat. 2656; Pub.L. 106-386, Div. B, Title I, § 1107(a), Oct. 28, 2000, 114 Stat. 1497; Pub.L. 109-162, Title I, §§ 114(b), 116(a), 117(a), Jan. 5, 2006, 119 Stat. 2988, 2989; Pub.L. 113-4, Title I, § 107(a), Mar. 7, 2013, 127 Stat. 77.)

Notes of Decisions (18)

18 U.S.C.A. § 2261, 18 USCA § 2261
Current through P.L.118-7. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 110A. Domestic Violence and Stalking

18 U.S.C.A. § 2262

§ 2262. Interstate violation of protection order

Effective: December 20, 2018
Currentness

**(a) Offenses.--**

**(1) Travel or conduct of offender.--**A person who travels in interstate or foreign commerce, or enters or leaves Indian country or is present within the special maritime and territorial jurisdiction of the United States, with the intent to engage in conduct that violates the portion of a protection order that prohibits or provides protection against violence, threats, or harassment against, contact or communication with, or physical proximity to, another person or the pet, service animal, emotional support animal, or horse of that person, or that would violate such a portion of a protection order in the jurisdiction in which the order was issued, and subsequently engages in such conduct, shall be punished as provided in subsection (b).

**(2) Causing travel of victim.--**A person who causes another person to travel in interstate or foreign commerce or to enter or leave Indian country by force, coercion, duress, or fraud, and in the course of, as a result of, or to facilitate such conduct or travel engages in conduct that violates the portion of a protection order that prohibits or provides protection against violence, threats, or harassment against, contact or communication with, or physical proximity to, another person or the pet, service animal, emotional support animal, or horse of that person, or that would violate such a portion of a protection order in the jurisdiction in which the order was issued, shall be punished as provided in subsection (b).

**(b) Penalties.--**A person who violates this section shall be fined under this title, imprisoned--

**(1)** for life or any term of years, if death of the victim results;

**(2)** for not more than 20 years if permanent disfigurement or life threatening bodily injury to the victim results;

**(3)** for not more than 10 years, if serious bodily injury to the victim results or if the offender uses a dangerous weapon during the offense;

**(4)** as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A (without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison); and

A-3

**(5)** for not more than 5 years, in any other case, including any case in which the offense is committed against a pet, service animal, emotional support animal, or horse,

or both fined and imprisoned.

## CREDIT(S)

(Added Pub.L. 103-322, Title IV, § 40221(a), Sept. 13, 1994, 108 Stat. 1927; amended Pub.L. 104-201, Div. A, Title X, § 1069(b)(2), Sept. 23, 1996, 110 Stat. 2656; Pub.L. 104-294, Title VI, § 605(d), Oct. 11, 1996, 110 Stat. 3509; Pub.L. 106-386, Div. B, Title I, § 1107(c), Oct. 28, 2000, 114 Stat. 1498; Pub.L. 109-162, Title I, § 117(b), Jan. 5, 2006, 119 Stat. 2989; Pub.L. 113-4, Title I, § 107(c), Mar. 7, 2013, 127 Stat. 78; Pub.L. 115-334, Title XII, § 12502(a)(2), Dec. 20, 2018, 132 Stat. 4982.)

Notes of Decisions (8)

18 U.S.C.A. § 2262, 18 USCA § 2262
Current through P.L.118-7. Some statute sections may be more current, see credits for details.

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.


# FEDERAL RULES

## OF

# EVIDENCE

————

DECEMBER 1, 2022



Printed for the use
of

THE COMMITTEE ON THE JUDICIARY

HOUSE OF REPRESENTATIVES

(d) a person authorized by statute to be present.

(As amended Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 25, 1988, eff. Nov. 1, 1988; Pub. L. 100–690, title VII, §7075(a), Nov. 18, 1988, 102 Stat. 4405; Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 26, 2011, eff. Dec. 1, 2011.)

ARTICLE VII. OPINIONS AND EXPERT TESTIMONY

## Rule 701. Opinion Testimony by Lay Witnesses

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

(As amended Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011.)

## Rule 702. Testimony by Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

(As amended Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011.)

## Rule 703. Bases of an Expert's Opinion Testimony

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

(As amended Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011.)

## Rule 704. Opinion on an Ultimate Issue

(a) IN GENERAL—NOT AUTOMATICALLY OBJECTIONABLE. An opinion is not objectionable just because it embraces an ultimate issue.

(b) EXCEPTION. In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the

**A-6**